Ruth N. Bishop v. Commissioner. Charles E. Bishop v. Commissioner. Charles E. Bishop and Ruth N. Bishop v. Commissioner.
Bishop v. Commissioner
Docket Nos. 80489-80491.
United States Tax Court
T.C. Memo 1962-146; 1962 Tax Ct. Memo LEXIS 163; 21 T.C.M. (CCH) 760; T.C.M. (RIA) 62146; June 19, 1962
*163 Petitioner, Charles E. Bishop, owned and operated several movie theaters and rental properties during the taxable years involved herein. Held: 1. That respondent was justified in resorting to the net worth plus nondeductible expenditures method to show understatements of income for the years in issue. Adjustments and understatements determined. 2. That some part of the deficiency for each of the taxable years 1947 through 1952 was due to fraud on the part of petitioners with intent to evade tax. Likewise, some part of the deficiency in income tax for each of the years 1953 and 1954, for which years Charles filed separate returns and Ruth filed no returns, was due to fraud with intent to evade tax on the part of Charles. Sec. 293(b), I.R.C. 1939, and sec. 6653(b), I.R.C. 1954. 3. That each of the returns of petitioners for the years 1947 through 1952, inclusive, and each of the returns of Charles E. Bishop for the years 1953 and 1954 was false and fraudulent with intent to evade taxes. 4. That petitioner, Ruth N. Bishop, is liable for additions to tax for the years 1953 and 1954 due to failure to file a return for each of said years. Sec. 291(a), I.R.C. 1939, and sec. 6651(a), I.R.C. 1954. *164 5. That petitioners have failed to meet their burden of proving that, for purposes of computing gain on repossession of theaters for the taxable year 1955, the fair market value of said theaters at the date of repossession was less than the amount ($125,000) determined by respondent. 6. That petitioners did not sustain capital losses in years subsequent to the taxable years involved herein which may be carried back to the years before the Court. Charles E. Bishop, pro se, Box 214, Newport, Wash. Norman H. McNeil, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: These consolidated proceedings involve the determination of deficiencies in income taxes and additions to taxes against petitioners for the taxable years 1947 to 1955, inclusive, as follows: Additions to Tax * *165 Docket No.
Petitioner
Year
Deficiency
Sec. 291(a)
Sec. 293(b)
80489
Ruth N. Bishop
1953
$ 1,974.15
$456.04
1954
1,516.89
680.43
80490
Charles E. Bishop
1953
2,055.15
$1,027.58
1954
1,431.89
1,318.36
80491
Charles E. and Ruth
1947
$ 4,287.95 **
$2,143.98 **
N. Bishop
1948
1,970.40
953.70
1949
940.16
470.08
1950
2,626.90
1,313.45
1951
7,780.01
3,890.00
1952
4,215.38
2,107.69
1955
24,179.65
The principal issues presented for our consideration are: (1) Whether respondent was justified in making use of the net worth plus expenditures method in reconstructing net income for the taxable years 1947 through 1954, inclusive; (2) whether and to what extent petitioners understated their net taxable income for the years 1947 through 1954; (3) whether any part of the deficiency determined against petitioners for each of the years 1947 to 1952, inclusive, was due to fraud with intent to evade tax within the meaning of section 293(b) of the 1939 Code; (4) with respect to petitioner, Charles E. Bishop, whether any part of the deficiency for each of the taxable years 1953 and 1954 was due to fraud with intent to evade tax within the purview of section 293(b), supra; and section 6653(b) of the 1954 Code; (5) whether petitioner, Ruth N. Bishop, is liable for additions to tax for the years 1953 and 1954 due to her failure to file a return for said years within the meaning of section 291(a) of the 1939 Code, *166 and section 6651(a) of the 1954 Code; (6) for the purpose of computing gain on reposession of theaters for the taxable year 1955, whether the fair market value of said theaters at the date of repossession was less than the amount ($125,000) determined by respondent, and (7) whether petitioners sustained capital losses in subsequent years which may be carried back to taxable years presently before the Court. Findings of Fact Part of the facts are stipulated (orally and in writing) and are so found and incorporated herein by this reference. Background and General Facts Petitioners, Charles E. and Ruth N. Bishop, are husband and wife residing at Newport, Washington. They filed Federal joint returns for each of the years 1947 through 1952, inclusive, with the collector of internal revenue, and filed a joint return for the year 1955 with the district director of internal revenue, both at Tacoma, Washington. Charles E. Bishop (hereinafter sometimes called Charles) filed Federal individual returns for the years 1953 and 1954 with the district director of internal revenue at Tacoma, Washington. Ruth filed no Federal income tax returns for the years 1953 and 1954. Prior to 1951, petitioners' *167 principal source of income was the operation of theaters in Newport, Ione, Metaline Falls and Cusick, Washington, and Priest River, Idaho. In 1951 and later years, income was derived from the sale of assets, interest, repossession of property sold, and rent. By July 1954, the aforesaid theater operations had been suspended. Petitioners' income tax returns showed Charles' principal activity as that of a movie theater operator. For the taxable years 1947 to 1952, inclusive, and for 1955 for which petitioners filed joint returns, and for the taxable years 1953 and 1954 for which Charles filed individual returns and Ruth filed no returns, adjusted gross income (loss) was reported as follows: Year
Income (loss)
1947
$ 3,552.89
1948
214.17
1949
3,124.84
1950
(1,552.04)
1951
5,792.48
1952
(2,233.19)
Charles
1953
(1,927.22)
Charles
1954
1,739.87
1955
4,162.30
Total
$12,874.10
By executing consent forms (872), Charles E. Bishop extended the statute of limitations on the 1953 and 1954 returns to June 30, 1959. Both taxpayers declined to extend the statute of limitations on the 1955 return which expired on April 4, 1959. Respondent mailed his statutory notice of deficiencies for the taxable years in controversy on March *168 23, 1959. Findings of Fact Propriety of Use of Net Worth and Expenditures Method All of petitioners' tax returns for the taxable years 1947 to 1954, inclusive, were prepared by an accountant based upon information supplied by Charles. The information was incomplete as hereinafter indicated. On September 15, 1955, after the commencement of a civil lawsuit against them regarding their sale of income-producing property to the plaintiffs, Snyder and Adams, petitioners visited respondent's Intelligence Division and dicslosed to a special agent that they had been understating gross income reported on their income tax returns from their theater business and concessions operated incidental thereto since the advent of television in late 1951. About a week later petitioners returned to the Intelligence Division office and brought some records and copies of their income tax returns for the period 1947 to 1953, from which respondent's agent made a preliminary net worth survey indicating purchases of assets substantially in excess of reported gross income for the period and supporting petitioners' admission that income had been understated. A formal investigation was then initiated by the Internal *169 Revenue Service. The then pending civil suit against the Bishops [1] concerned matters closely connected to their previous ownership and operation of two theaters and a laundromat sold in 1954 for $125,000 to the plaintiffs. Plaintiffs, among other things, alleged misrepresentation on the part of the Bishops with respect to past profits of the theaters and laundromat and sought recision of the sale. By way of answer to the complaint, petitioners claimed that their business net income on a capital outlay and disbursements basis for the years 1951 to July 1954 (the date of sale) showed amounts of business net income sufficient to support all representations they had made to the plaintiffs as follows: 1951
1952
1953
July 1954
Capital Expenditures
$36,356.71
$28,311.08
$39,547.72
$28,002.52
Living Expenses
4,122.24
4,395.29
6,689.66
10,711.84
Approximate Business Net Income
$40,478.95
$32,706.37
$46,237.38
$38,714.36
Other Income
7,496.43
10,005.86
5,229.42
Total Income and Gain
$40,202.80
$56,243.24
$43,943.78
*170 Petitioners owned the aforesaid laundromat but never operated it as their own business. All the income from that business went to their son, Lloyd. Their son paid no rent for the use of the equipment or space. Although Charles has no exact knowledge of the amounts, profits from the operation of his theaters occurred in each of the taxable years 1951, 1952, 1953 and the first six months of 1954. The net profit from theater operations for the first six months of 1954 was in excess of $5,000. Apart from income (gain) on the sale of theater properties and earnings from operating theaters during the years 1951 to July 1954, inclusive, petitioners had no regular source of income. Charles did all of his "bookkeeping" in his checkbook which was the only record he kept. At the end of each month he would copy from his checkbook the monthly expenses and send the list to his accountant. The accountant, who made out petitioners' Federal income tax returns, was never furnished information regarding total income to report on said returns. Charles advised the accountant only of an amount sufficient to cover the expenses reported. Based upon petitioners' statement that income had been understated in *171 their Federal tax returns since the latter part of 1951, respondent's agent undertook preparation of a net worth analysis from third party records. Respondent's agent selected December 31, 1946, as the starting point of his investigation because that date was within a year of the time the Bishops moved to Newport, Washington, acquired a substantial asset, and commenced in the theater business. Also, Charles had submitted financial statements to the local Newport bank in connection with obtaining loans or mortgages in 1946 and 1947. In the course of the afore-mentioned civil litigation concerning the 1954 sale of property to Snyder-Adams, Charles testified as follows: I came to town with less than $20,000 ten years ago, and when I left town I built three new theaters in the ten years I was here and left with a very nice financial statement, so I operated at a profit all the time I was here. In December 1951, petitioners sold three theater properties to Robert T. and Carmen Hagman. As part of said transaction, the Hagmans separately undertook to purchase from petitioners merchandise and supplies (peanuts, popcorn, candy, etc.) and also rental films. Inventory and film rental payments *172 by the Hagmans to the petitioners were made during 1951 and 1952. Hagman also purchased 265 upholstered theater seats from Charles for $2 per seat on September 22, 1952. The Hagmans continued to rent film from petitioners during the first month of 1953. The Hagmans paid petitioners $1,700.21 in 1951, and $1,400.66 in 1952 for inventory and film rental. Said amounts, as well as the proceeds of the sale of the theater seats in 1952, were not reported on petitioners' tax returns for 1951 and 1952. Charles did not report any income from sale of inventory or film rental from the Hagmans in his 1953 return. Charles received payments from United Film Service for advertising films shown in his various theaters, which payments he usually turned over to his employees in payment of wages. United Film Service paid Charles $88 during 1954. Records regarding payments for earlier years were unavailable. Charles did not report receipt of the $88 from United Film Service in his 1954 return. In July 1954, petitioners entered into an agreement with Snyder and Adams to sell them certain theaters and a laundromat. In a separate transaction Snyder and Adams also purchased inventory from petitioners. Petitioners *173 admit they did not correctly record and report income from concessions in their theaters for the years 1951 to 1953, inclusive. There is no evidence as to what petitioners' income from concessions was during any of the years in dispute. Petitioners failed to record and report interest income from Frances White in each of the years 1951, 1952 and 1953. Respondent's agent sampled cancelled checks against records of business expense for 1951 and 1952 to ascertain whether any disbursements were actually expended for other than business purposes. Of 157 checks examined totaling $4,502, 30 percent represented disbursements for other than business purposes. Inadequate records prevented detailed examination into 1953 and 1954. Respondent's agent also made an analysis of petitioner's bank deposits, cancelled checks and cash expenditures for the years 1951 to 1954, inclusive, in order to check the accuracy of the net worth analysis previously prepared. The bank deposit analysis showed unreported income contrasted with unreported income per net worth analysis as follows: Bank Deposit Method
1951
1952
1953
1954
Unreported Adjusted Gross Income
$25,894.35
$21,438.49
$20,299.01
$21,075.89
Net Worth Method
Unreported Adjusted Gross Income
$24,235.46
$19,675.46
$18,822.21
$21,141.16
*174 The following Schedule A shows the reconstruction of net worth and resultant understatement of income for petitioners for each of the taxable years 1947 through 1954, inclusive, as determined by respondent's agent after taking into consideration concessions by respondent at the trial. SCHEDULE A
NET WORTH - CHARLES E. and RUTH N. BISHOP
Item
1946
1947
1948
Assets
(c) 1. Cash on Hand
(c) 2. Checking Account
$ 1,500.00
$ 1,500.00
$ 1,500.00
(c)(s) 3. Savings Account
7.21
7.27
(c) 4. Newport Theater (Old)
25,000.00
26,776.24
28,372.29
5. Ione-Metaline Falls Theaters
18,000.00
18,641.34
18,641.34
(c) 6. Newport Theater (New)
10,500.00
11,693.14
(c) 7. Priest River Theater
(c) 8. Frances White
9. B. F. Shearer Co.
(c)10. Skyline Theater Stock
(c)(s)11. Autos
575.00
12. Hagman Contract
13. Hagman Deposit
14. Vanairsdale Contract
15. Snyder-Adams Contract
(c) 16. House Trailer
Total Assets
$ 44,500.00
$ 57,424.79
$ 60,789.04
Liabilities
17. Marie Malkson
$ 13,400.00
$ 18,089.69
$ 11,700.00
18. D. Mangoni
12,217.00
19. Sue Edmiston
5,500.00
5,100.00
(c)20. L. A. Frakes
21. Farmers State Bank
22. Washington Trust Bank
23. B. F. Shearer Co.
1,596.05
(s)24. Depreciation Reserve
846.97
3,407.56
6,314.01
(s)25. Hagman-Deferred Profits
(s)26. Vanairsdale-Def. Profits
3,657.00
(s)27. Snyder-Adams-Deferred Profits
Total Liabilities & Res.
$ 26,463.97
$ 28,593.30
$ 23,114.01
Net Worth
$ 18,036.03
$ 28,831.49
$ 37,675.03
Less: Prior Net Worth
18,036.03
28,831.49
Net Worth Increase
$ 10,795.46
$ 8,843.54
(s)28. Less: Nontaxable Capital Gains
Difference
(c)(s)29. Add: Personal Living Expense
3,430.12
2,884.77
30. Income Taxes Paid
243.33
106.34
(s)31. Personal Loss
Corrected Adjusted Gross Income
$ 14,468.91
$ 11,834.65
(c) Contested
(s) Stipulated
SCHEDULE A
NET WORTH - CHARLES E. and RUTH N. BISHOP
Item
1949
1950
1951
Assets
(c) 1. Cash on Hand
(c) 2. Checking Account
$ 1,500.00
$ 3,275.47
$ 2,106.05
(c)(s) 3. Savings Account
7.73
7.39
7.49
(c) 4. Newport Theater (Old)
30,336.80
30,336.80
30,336.80
5. Ione-Metaline Falls Theaters
21,256.20
41,170.85
(c) 6. Newport Theater (New)
12,683.32
14,685.94
38,032.71
(c) 7. Priest River Theater
15,000.00
15,000.00
(c) 8. Frances White
25,000.00
23,986.70
9. B. F. Shearer Co.
735.84
1,735.84
(c)10. Skyline Theater Stock
(c)(s)11. Autos
575.00
575.00
2,250.00
12. Hagman Contract
60,000.00
13. Hagman Deposit
15,000.00
14. Vanairsdale Contract
15. Snyder-Adams Contract
(c) 16. House Trailer
Total Assets
$ 66,359.05
$130,787.29
$188,455.59
Liabilities
17. Marie Malkson
$ 9,900.00
$15,700.00
$ 14,500.00
18. D. Mangoni
19. Sue Edmiston
4,750.00
4,350.00
(c)20. L. A. Frakes
25,000.00
19,250.00
21. Farmers State Bank
8,750.00
10,703.28
22. Washington Trust Bank
10,760.10
23. B. F. Shearer Co.
8,602.46
5,734.80
(s)24. Depreciation Reserve
9,447.65
15,282.56
11,553.44
(s)25. Hagman-Deferred Profits
31,668.00
(s)26. Vanairsdale-Def. Profits
3,657.00
(s)27. Snyder-Adams-Deferred Profits
Total Liabilities & Res.
$ 24,097.65
$ 77,685.02
$104,169.62
Net Worth
$ 42,261.40
$ 53,102.27
$ 84,285.97
Less: Prior Net Worth
37,675.03
42,261.40
53,102.27
Net Worth Increase
$ 4,586.37
$ 10,840.87
$ 31,183.70
(s)28. Less: Nontaxable Capital Gains
5,278.00
Difference
(c)(s)29. Add: Personal Living Expense
2,389.29
$ 2,010.10
4,122.24
30. Income Taxes Paid
132.00
(s)31. Personal Loss
Corrected Adjusted Gross Income
$ 6,975.66
$ 12,982.97
$ 30,027.94
(c) Contested
(s) Stipulated
SCHEDULE A
NET WORTH - CHARLES E. and RUTH N. BISHOP
Item
1952
1953
1954
Assets
(c) 1. Cash on Hand
$ 11,363.72
(c) 2. Checking Account
$ 2,504.72
$ 1,395.79
106.92
(c)(s) 3. Savings Account
185.08
7,085.06
539.30
(c) 4. Newport Theater (Old)
5. Ione-Metaline Falls Theaters
(c) 6. Newport Theater (New)
73,440.58
81,300.19
2,358.00
(c) 7. Priest River Theater
15,000.00
15,000.00
(c) 8. Frances White
23,262.55
23,031.42
23,031.42
9. B. F. Shearer Co.
(c)10. Skyline Theater Stock
4,235.00
(c)(s)11. Autos
2,250.00
2,250.00
2,453.38
12. Hagman Contract
55,654.96
51,200.05
46,563.73
13. Hagman Deposit
14. Vanairsdale Contract
19,600.00
17,400.00
15,000.00
15. Snyder-Adams Contract
109,052.47
(c) 16. House Trailer
3,000.00
Total Assets
$196,132.89
$198,662.51
$213,468.94
Liabilities
17. Marie Malkson
$ 10,553.08
$ 9,253.74
$ 7,885.37
18. D. Mangoni
19. Sue Edmiston
(c)20. L. A. Frakes
15,047.00
9,742.82
21. Farmers State Bank
10,037.97
9,669.32
7,650.64
22. Washington Trust Bank
10,036.81
10,635.98
23. B. F. Shearer Co.
10,009.59
4,714.57
(s)24. Depreciation Reserve
7,805.09
13,242.07
954.38
(s)25. Hagman-Deferred Profits
29,374.69
27,023.39
24,576.34
(s)26. Vanairsdale-Def. Profits
4,778.48
4,242.12
3,657.00
(s)27. Snyder-Adams-Deferred Profits
38,659.10
Total Liabilities & Res.
$ 97,643.54
$ 88,524.01
$ 83,382.83
Net Worth
$ 98,489.35
$110,138.50
$130,086.11
Less: Prior Net Worth
84,285.97
98,489.35
110,138.50
Net Worth Increase
$ 14,203.38
$ 11,649.15
$ 19,947.61
(s)28. Less: Nontaxable Capital Gains
1,804.91
1,443.82
4,342.78
Difference
(c)(s)29. Add: Personal Living Expense
4,395.29
6,689.66
6,965.38
30. Income Taxes Paid
648.51
(s)31. Personal Loss
310.82
Corrected Adjusted Gross Income
$ 17,442.27
$ 16,894.99
$ 22,881.03
(c) Contested
(s) Stipulated
*175 The following Schedule B shows petitioners' unreported income as determined by respondent adjusted by taking into consideration concessions by respondent at the trial. SCHEDULE B
SCHEDULE B
1947
1948
1949
1950
Corrected Adjusted Gross Income
$14,468.91
$11,834.65
$ 6,975.66
$12,982.97
Reported (loss)
3,552.89
214.17
3,124.84
(1,552.04)
Unreported
$10,916.02
$11,620.48
$ 3,850.82
$14,535.01
SCHEDULE B
1951
1952
1953 *
1954 *
Corrected Adjusted Gross Income
$30,027.94
$17,442.27
$16,894.99
$22,881.03
Reported (loss)
5,792.48
(2,233.19)
(1,927.22)
1,739.87
Unreported
$24,235.46
$19,675.46
$18,822.21
$21,141.16
Over the period 1947 to 1954, inclusive, the Bishops reported a total income of $8,711.80, whereas analysis of their net worth for the same period evidences a total understatement of gross income in the amount of $124,796.62. Opinion Propriety of Use of Net Worth and Expenditures Method On the basis of the foregoing findings, we discuss petitioners' contention that their books and records were adequate as a basis for determining income, and that respondent *176 is for that reason, precluded from resorting to the so-called net worth plus expenditures method to show substantial understatements of income or as evidence of corrected income. While, as discussed infra, we do not agree that respondent's right to use the net worth approach is dependent upon some patent defect in the books and records of the taxpayer, we think it clear that if reasons must be assigned, they are ample in the instant case. The record shows that on September 15, 1955, after civil litigation instituted against petitioners regarding their sale of income-producing property, they visited respondent's Intelligence Division and disclosed to a special agent that they had been understating gross income reported on their returns from their theater business and concessions operated incidental thereto. Thereafter, a formal investigation revealed that petitioners used only a checkbook for record keeping purposes, and that Charles did not advise his accountant of petitioners' total income, but only an amount sufficient to cover expenses reported to the accountant. Also, the record shows petitioners failed to report inventory and film rental proceeds from the Hagmans in their returns *177 for 1951 and 1952 ($1,700.21 in 1951 and $1,400.66 in 1952), or proceeds from the sale of theater seats in 1952. Nor did Charles report any income from sale of inventory or from rental film from the Hagmans in his 1953 return. Similarly, in 1954, Charles received $1,154 from Snyder and Adams for inventory which amount is not reported in his 1954 return. The revenue agent assigned to petitioners' case discovered many inaccuracies in the records of petitioners and was unable to verify all of the income because there were no sufficient supporting records. The agent sampled cancelled checks against records of business expense for 1951 and 1952 to ascertain whether any disbursements were actually expended for other than business purposes. Of 157 checks examined for 1951 and 1952, totaling $4,502 in amount, 30 percent represented disbursements for other than business purposes. Inadequate records prevented examination into 1953 and 1954. These items, while relatively small in amount, are suggestive nevertheless of the need of audit or check up which will bring all the facts to light. In the circumstances of this case, where petitioners admittedly withheld an undertermined amount of earnings, *178 and where there are no complete and reliable records, respondent was obliged to resort to some reasonably effective technique for the determination of income, and petitioners, by merely alleging that complete records were kept, cannot deprive respondent of the right to use a practical method of making his determination and checking on petitioners' returns. Obviously, petitioners' difficulty is of their own making in failing to keep proper records either of their business activities or other facts material to the determination of their income liability. The right of respondent to resort to the net worth method is not dependent on finding first (and without regard to the implications of the net worth computation) that petitioners' books and records were not sufficient to properly reflect income. It is quite possible that even though a taxpayer may have a complete set of books and may employ a method of accounting which is capable of accurately reflecting the taxpayer's income, there may be false or incorrect entries made on his books, such as nonbusiness expenses, omission of cash receipts, and the like. In Estate of W. D. Bartlett, 22 T.C. 1228 (1954), we held that where the taxpayer *179 presents a set of books and records which appear to be superficially adequate, the so-called net worth method may be resorted to and applied as a technique for disclosing a substantial gap between actual income and reporting income, and thereby suggest untrustworthiness of the books as a whole. See also Morris Lipsitz, 21 T.C. 917 (1954), aff'd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). This view, of course, recognizes that the so-called net worth method is not itself a system of accounting but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer in keeping his books. By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy as being attributable to gifts, inheritances, or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. Michael Potson, 22 T.C. 912 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956); Estate of George L. Cury, 23 T.C. 305 (1954); *180 Harry Gleis, 24 T.C. 941 (1955), affd. 245 F. 2d 237 (C.A. 6, 1957). In this connection, the Supreme Court said, in part, in Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955), at p. 131: The net worth technique, as used in this case, is not a method of accounting different from the one employed by defendants. It is not a method of accounting at all, except insofar as it calls upon taxpayers to account for their unexplained income. Petitioners' accounting system was appropriate for their business purposes; and, admittedly, the Government did not detect any specific false entries therein. Nevertheless, if we believe the Government's evidence, as the jury did, we must conclude that the defendants' books were more consistent than truthful, and that many items of income had disappeared before they had even reached the recording stage. Certainly Congress never intended to make § 41 a set of blinders which prevents the Government from looking beyond the selfserving declarations in a taxpayer's books. * * * We, therefore, may not restrict the respondent to the finding of particular inaccuracies, omissions, or defalcations in the taxpayers' books. Such *181 may or may not exist and may or may not be discernible. Those which we have pointed out in the instant case, supra, add to, rather than reduce, the need of using the net worth method. Judge Goodrich, although speaking particularly of the expenditure factor, clearly and briefly explains the net worth approach in United States v. Caserta, 199 F. 2d 905, 907 (1942) (pp. 906-907), in which he said, in part: An outgrowth of this net worth method is the "expenditure" test involved in this case. The theory of it is simple, though its application may become difficult. It starts with an appraisal of the taxpayer's net worth situation at the beginning of a period. He may have much or he may have nothing. If, during that period, his expenditures have exceeded the amount he has returned as income and his net worth at the end of the period is the same as it was at the beginning (or any difference accounted for), then it may be concluded that his income tax return shows less income than he has in fact received. * * * It may be added that respondent has not determined petitioners' income on the bank deposit method or with respect to the specific items in dispute in this case, as petitioners suggest *182 on brief. Here, the bank deposit analysis for the years in question is submitted by respondent merely as corroborative of the essential results of the use of the net worth method. Under the circumstances, it is our view that the use of the net worth method by respondent was fully justified as a test of the accuracy of petitioners' income tax returns and also as evidence of their correct net income. By the same token, we hold that the use of the net worth method in determining the deficiency was not arbitrary. Jack M. Chesbro, 21 T.C. 123, 128 (1953), affd. 225 F. 2d 674 (C.A. 2, 1955). Understatements of Income Introductory Preliminarily, we note that petitioner tried his own case without benefit of legal counsel. On brief, petitioners aver that "in presenting their own case some of their most important evidence was not admitted by the Court," but that respondent and his agent had seen all the evidence. Petitioner has not directed our attention to the particular evidence to which he refers and we are not aware of the nature, admissibility, or probative value thereof. Since the burden of proof on the issue of deficiencies rests with petitioners, the onus is upon them to present *183 to the Court any evidence upon which they wish to rely in order that the Court may consider and evaluate it. For clarity, we discuss the burden of proof as to deficiencies, including the specific items in dispute, at this point to avoid repetition as we progress. It is well settled that the burden of proof rests with petitioner to show error in respondent's determination of deficiencies subject to the exceptions referred to below. In American Pipe & Steel Corp. v. Commissioner, 243 F. 2d 125-126 (C.A. 9, 1957), affirming this Court's opinion at 25 T.C. 351 (1955), the Court of Appeals said, in part, p. 126: Petitioner, having invoked the jurisdiction of the Tax Court, entered the hearing burdened with the duty of establishing by at least a preponderance of the evidence that the determination made by the Commissioner was erroneous. * * * To the same effect, see also Greenwood, Adm. v. Commissioner, 134 F. 2d 915, 919 (C.A. 9, 1943), affirming 46 B.T.A. 832 (1942). The exceptions above referred to, to the extent here significant, are that the burden of proving claimed increases in deficiencies and additions to tax, affirmatively alleged by amended answer (for the taxable year 1947) *184 rests on respondent. For completeness at this point, we add that the burden of proof of fraud by clear and convincing evidence rests with respondent. Joseph V. Moriarity, 18 T.C. 327, 329 (1952), affd. per curiam, 208 F. 2d 43 (C.A.D.C. 1953). For convenience, we have set out, supra, our Schedules A and B which set forth the understatements which we have determined for the years here involved. Some of the items therein were stipulated, and others, though not stipulated, were undisputed. Items which have been stipulated by the parties are indicated by the letter "s." Contested items are indicated by the letter "c." Items without designation are uncontested. Where a contested item raises an issue of fact, we resolve the issue in our findings relating thereto with further explanation in our opinion to the extent that elaboration of the basis for our ultimate findings seems required. Where the contested item involves the burden of proof, we likewise explain our views in our opinion. Our findings of fact and opinion with respect to the disputed items will be set forth infra in the order in which they appear on Schedule A, supra. We will consider, under succeeding headings the various *185 issues specifically disputed, including those relating to the adjustments actually made. Findings and Opinion Cash on Hand (Item 1) It is necessary in the use of the net worth method to determine, with reasonable accuracy, an opening net worth to serve as a starting point from which to calculate future increases in taxpayer's assets. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932. A significant issue in this respect is opening cash on hand at December 31, 1946. Respondent, in reconstructing petitioner's net worth for the taxable years involved, does not include any cash on hand except for an ending cash balance as of December 31, 1954, in the amount of $11,363.72, upon which the parties have agreed, which is not significant here in relation to opening and closing net worth. Thus, in effect, respondent determined that no cash was on hand as of December 31 of each of the years 1946 to 1953, inclusive. Petitioner, on the other hand, claims that he had cash on hand as of December 31 of each of said years in some indefinite amount to the use of which the increases in net worth were attributable, and that such increases were not attributable to current taxable *186 income. So far as the deficiencies are concerned, petitioner carries the burden of proving error in respondent's determination. Carmack v. Commissioner, 183 F. 2d 1 (C.A. 5, 1950), certiorari denied 340 U.S. 875 (1950). As to the issue of cash on hand, we do not think petitioner has met this burden. In his testimony in the instant case, petitioner claims that he had from $40,000 to $50,000 in cash and Government bonds in 1945. His testimony is vague, indefinite, and inconsistent with other statements by him discussed infra and is unacceptable as proof of his claim. We are not impressed with petitioner's story that his alleged cash hoard and personal assets were kept secreted in some undesignated place and brought to Newport at some indefinite date subsequent to 1945. Other than some generalized statements of Ruth, there is no corroboration of the existence of a hoard, and no bookkeeping or other records supporting the alleged facts. The necessity of keeping adequate records is axiomatic. We cannot replace evidence (or the lack of it) by conjecture. Any failure of taxpayers to protect themselves by compliance with the law and regulations with respect to keeping proper records must *187 be at their own risk. Petitioner claims that he paid cash during 1945 and 1946 as follows: 1945-46
Old Newport Theater
$25,000
1946
Three other theaters -
down payment
6,000
1945
Remodeling begun - Old
(amount not
Newport Theater
ascertained)
1945
Started construction -
(amount not
New Newport Theater
ascertained)
$31,000 The record is by no means clear that petitioner paid $25,000 in cash during 1945 and 1946, but assuming that he paid $31,000 in cash during those years for the four theaters, it does not establish his contention. The payments are claimed to have been made prior to December 31, 1946, and reduced any cash on hand to the extent thereof. There is no evidence that he thereafter had any cash left over except the indefinite amounts he claims to have paid for remodeling and construction, but he claims that these amounts were likewise paid prior to December 31, 1946. Thus, these figures do not establish cash on hand as of December 31, 1946, and the best we can infer is that some time prior to that date he entered into substantial cash transactions. Petitioner further claims that he paid cash during 1947 as follows: Automobile
$2,018.20
Sue Edmiston property
5,000.00
New equipment
1,596.05
Total
$8,614.25
Assuming *188 that these payments were made in cash in 1947, there is no acceptable evidence that petitioner had such cash on hand December 31, 1946. At least one possible source was 1947 current (unreported) earnings, and the record as a whole, including his admissions, supports the fact that he did fail to report earnings on a number of occasions. Petitioner testified in an earlier (nontax) case that he came to Newport in 1945 with less than $20,000. In the instant case, when it was apparent that it would be to his advantage to do so, he claimed that he brought more money in later. Again, however, there was no explanation of the previous whereabouts of these funds, the source of them, or any corroboration of their existence except some generalized statements of his wife who admitted she did not know the amounts of cash and bonds held by her husband. Likewise, the claim is not supported by books and records. There is documentary evidence, as of dates close to and reflecting upon petitioner's net worth, consisting of two financial statements presented to the local bank as of October 10, 1946, and January 14, 1947, respectively. We realize that petitioner was not legally required to state all of *189 his cash or other assets to the bank but there are indications that he intended to do so in round figures. On the financial statement of October 4, 1946, he included cash at $2,500 and Government securities at $1,675. On the statement of January 14, 1947, he included cash on hand and bank as $1,500. No item was included for securities. Thus, he is discriminating as between cash items not only with respect to amount, but also with respect to cash on hand and in bank. He likewise discriminates between Government securities in October, and the absence of them in January. On the issue of cash on hand, we disregard the item of Government securities in the statement of October 8, 1946, because there is no evidence that petitioner owned them on December 31, 1946. As to the cash itself, there is no proof of the amount of $2,500 as of December 31, 1946, but we allow the item of $1,500 referred to in the financial statement of January 14, 1947, because of the probability that at least that amount was still in the bank as of December 31, 1946. The item of $1,500 is included in our revised net worth statement in Item 2, Checking Account. It would not affect the result if it were included in Item *190 1 instead. It may be added that petitioners did not furnish respondent with any leads or show a likely source of income which contributed to the cache in question. In Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932, the Supreme Court said, in part, (p. 137): But where relevant leads are not forth-coming the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant. * * * After careful review and analysis of the record, we find that petitioner has failed to meet his burden of proving error with respect to respondent's determination insofar as here under discussion. See Condor Merritt v. Commissioner, 301 F. 2d 484 (C.A. 5, 1962). The testimony of Ruth was vague and valueless. Proper records were not kept by petitioner. No corroboration was produced. Petitioner himself proved unworthy of belief. On the basis of the foregoing, our adjusted net worth statement (Schedule A) shows no cash on hand as of December 31 of the years 1946 to 1953, inclusive. The ending cash balance of $11,363.72 for the year 1954 is traceable to the sale of petitioners' theaters during 1954, and the *191 item is not in dispute. Findings Checking Account (Item 2) Petitioners had a checking account during the years 1946 to 1949, inclusive. However, bank records reflecting the exact balance at the end of each of said years were not available. Respondent's agent based the balance of the checking account as of December 31, 1946, upon the $1,500 balance submitted by Charles in the financial statement of January 14, 1947. The balance of $1,500 was included at the end of each of the years 1947 to 1949, inclusive, after which time year-end balances are agreed upon by the parties. Opinion Checking Account (Item 2) Petitioners contend that their checking account cannot be used by respondent as a method of determining unreported income for the years involved herein since portions of said account included a redeposit of previously withdrawn funds, interest previously reported and a repayment of loans. Petitioners have not adduced any acceptable evidence to support their contention that the bank deposits for each of the years 1946 through 1949, inclusive, included such items. Even if the facts were as petitioners contend, however, the result would be the same because the computation was on the *192 net worth basis (not the bank deposit method) which requires inclusion of assets as of the end of the year against which are balanced assets as of the beginning of the year. The burden rests with petitioners to prove that they owned such assets as of the beginning of the year, but that they were not included in the opening net worth of such year. Petitioners have failed to present any such proof. Findings of Fact and Opinion Savings Account (Item 3) We turn to consider petitioners' claim, on brief, that respondent's beginning net worth statement failed to include two savings accounts in their name in the Farmers State Bank in Newport, Washington. We find this claim to be unsupported by the evidence presented. At the trial, the parties stipulated that as of December 31, 1953, petitioners had a balance of $2,085.60 in the Farmers State Bank, Newport, Washington, and a balance of $5,000 in the Bank of North Idaho, Priest River, Idaho, or a total balance of $7,085.60. Item 3 of the net worth schedule as of December 31, 1953, now reflects these factors. There is no evidence as to the balance of said accounts for other years involved herein. If petitioners contend that respondent has failed *193 to include other savings accounts than those discussed above, there is no evidence to support such contention, and respondent's determination, as adjusted, is sustained. Findings of Fact Cost Basis of Newport Theater (New) (Items 4 and 6) Respondent determined that the cost basis of the Newport Theater (New) on December 31, 1952, was $73,440.58. During 1953 additional expenditures of $7,859.61 were made by petitioners which increased the cost basis of the theater to $81,300.19 as of December 31, 1953. In making this determination, respondent analyzed petitioners' bank records, cancelled checks, expenditures recorded in their books, and purchases of theater equipment. The Newport Theater (New) was one of the businesses sold to Snyder and Adams in July 1954. An additional $162.69 had been expended on the theater during the first six months of 1954. At the time of the sale, Charles retained 3-D equipment valued at $2,358. As of December 31, 1954, respondent eliminated from his net worth schedule the cost basis of the theater sold to Snyder-Adams, except for the aforesaid 3-D equipment retained by Charles. Depreciation adjustments were allowed on the equipment. Petitioners concede cost *194 basis for the Newport Theater (New) for the years ending December 31, 1952, and 1953 only to the extent of $49,000. Opinion Cost Basis of Newport Theater (New) (Items 4 and 6) Respondent determined that the cost basis of the Newport Theater (New) as of December 31, 1952, and 1953 was $73,440.58 and $81,300.19, respectively, and the cost of the 3-D equipment remaining at December 31, 1954, was $2,358. Petitioners stipulated the cost basis of said theater as of December 31, 1947, through 1953, only to the extent of $49,000. Petitioners, on brief, concede further that the basis of the Newport Theater (New) as of December 31, 1952, and 1953, was $56,859.61. It is petitioners' position that Charles and his son did most of the work on said building, even to the extent of making their own cement blocks; and that the cost basis of the theater as of December 31, 1952, was computed by two accountants to be $49,000. As stated in our findings hereinabove, respondent based his determination on an analysis of the petitioners' records relating to the cost of constructing the theater and installing the equipment. Petitioners, who bear the burden of proof, have failed to introduce any convincing evidence *195 to overcome respondent's determination. Accordingly, respondent must be sustained on this issue. As to the 3-D equipment in dispute, respondent carried the cost basis thereof valued at $2,358 into the year ending December 31, 1954. Petitioner urges that respondent erred by charging twice for the 3-D equipment which was in the Newport Theater (Old) and moved to the Newport Theater (New) building. Petitioners argue that if this equipment is charged against the new building, it should first be removed from the charges against the old theater building, since there was only one theater in operation in Newport, Washington, during the net worth period. In our view respondent did not duplicate the item of equipment since the amount of $2,358 was deducted from the cost basis of the Old Newport Theater and added to the cost of the new theater. Furthermore, we find no merit in petitioners' argument that the 3-D equipment should be eliminated entirely from the net worth statement because it was obsolete in less than one year's time, that is, 1955, and had been charged off by their accountant as a complete loss. No evidence of such obsolescence in the year 1954 or 1955 was introduced by petitioners. *196 Under the circumstances, respondent's determination on this issue must stand. Findings of Fact Frakes Transaction (Items 7, 8 and 20) On January 1, 1950, petitioners purchased from Lee and Agnes Frakes certain buildings and equipment and took assignment of a leasehold with respect to three theaters situated respectively in Garfield and Palouse, Washington, and Priest River, Idaho, for a total purchase price of $50,000. The escrow contract between the Bishops and Frakes called for a $20,000 down payment and payments of $500 per month on the balance with three percent on all deferred balances of principal, also payable monthly. The contract was executed by petitioners on January 24, 1950, and pursuant to the terms of the contract, the first payment of $575 ( $500 for principal) was made March 3, 1950. Said contract was closed out by the bank and returned to the Bishops and Frakes in July 1954, at which time petitioners sold the Priest River Theater to Snyder-Adams. The balance of the escrow contract due from the Bishops to the Frakes at December 31st of each of the years 1950 to 1953, was $25,000, $19,250, $15,047.83, and $9,742.82 as determined by respondent. Petitioners agreed to *197 sell the theaters located in Garfield and Palouse, Washington, to Frances White, Charles's sister, for $35,000. Frances paid down $10,000, which amount Charles used along with $10,000 of his own cash to make the down payment to Lee and Agnes Frakes. The agreement of sale for the Garfield and Palouse theaters between Charles and his sister was in writing, but not recorded. The agreement called for three percent interest on unpaid balances of principal. Frances paid in a total of $4,707.93 during the taxable years 1950 to 1953, inclusive, but made no payments in 1954. In order to determine the declining balance of the White contract receivable during the years 1950 to 1954, inclusive, respondent computed interest on unpaid balances of principal and determined that of the $4,707.93, $1,968.58 should be applied to reduction of principal, and $2,739.35 to interest, as follows: Interest
Principal
Year
Received
Received
1951
$1,321.87
$1,013.30 * *198 1952
719.60
724.15
1953
697.88
1,968.58
Totals
$2,739.35
$1,968.58
Charles kept no record of any receipt of interest on the contract from his sister. Opinion Frakes Transaction (Items 7, 8 and 20) Although petitioners would not agree on the basis of the Priest River Theater (Item 7), Frances White receivable (Item 8), and the Frakes liability, (Item 20), they do not question either the amounts or the nature of the transactions involved. Petitioners, however, contest the item of interest in the White transaction and the amounts of the alleged write-off in the Frakes's and White contracts. Petitioners take the position that interest was not charged on the transaction with White, and all payments were applied to the principal indebtedness. Petitioners contend further that Frances testified that there was a write-off on the balance of her "agreement" with petitioners of $20,292.07 because of the adverse economic effect of television on the movie theater business. We disagree. The record contains no such testimony. As no affirmative evidence was adduced to establish that interest was not paid by Frances, or that petitioners forgave her indebtedness in the amount of $20,292.07, respondent must be sustained *199 on this issue. Petitioners, on brief, aver that there was also a write-off on the Frakes's contract in the amount of $9,742, resulting in a loss of $10,450 to petitioners. There is no evidence to support the conclusion that the liability to Frakes was liquidated in 1953. In the absence of any evidence to support petitioners' argument, we hold that the balance of the escrow contract due from petitioners to the Frakes as of the end of each of the years 1950 through 1953, inclusive, was $25,000, $19,250, $15,047.83 and $9,742.82, respectively, as determined by respondent. It may be added that petitioners' assets and liabilities traceable to the Frakes's transaction are eliminated by respondent in 1954. With respect to the Priest River Theater (Item 7), since petitioners presented no evidence to overcome the burden of proof of error in respondent's determination of the cost basis of said property, respondent is likewise sustained on this item. Findings of Fact and Opinion Skyline Theater Stock (Item 10) Respondent, in his net worth schedule, determined that petitioners owned stock in the Skyline Theater as of December 31, 1952, with a cost basis of $4,235, and that said stock was not *200 owned by them as of the end of 1953 and 1954. Petitioners, on brief, contend that Charles purchased 100 shares of said stock at $100 per share, or a total cost of $10,000 on July 1, 1952, but that he withdrew from the enterprise and sold his shares to another stockholder at cost, without any gain on the transaction. Respondent, in opposition, maintains that said item was agreed upon by the parties to be in the amount of $4,235 as of December 31, 1953. Again, the burden of proof is upon petitioners, and since they have failed to adduce any evidence to support their allegation, respondent's determination will not be disturbed. Findings of Fact Automobiles (Item 11) During 1947 petitioners owned a 1947 Hudson automobile which they purchased on June 3, 1947. Respondent's agent was not provided with information regarding this asset at the time of his investigation and, consequently, he did not attribute to petitioners ownership of any automobile for 1947. Petitioners paid $2,018.20 for said automobile which they still owned on December 31, 1947. For the years ending December 31, 1948 to 1950, inclusive, respondent determined that petitioners owned an automobile with a cost basis of $575. *201 Opinion Automobiles (Item 11) The evidence shows that petitioners purchased the Hudson automobile in 1947 for $2,018.20 and that they still owned it on December 31, 1947. It is clear that it should be included in net worth as of that date. Respondent amended his answer accordingly. Petitioners claim they paid for the auto in cash and urge that the amount of $2,018.20 be included as cash in their opening net worth as of December 31, 1946. In our opinion the evidence does not support this contention, and we affirm respondent in this respect. Petitioners, on brief, contend that the sum of $575 which respondent determined to be the cost basis of the automobile listed in Item 1 of the original net worth determination for the years ending December 31, 1948, to 1950, inclusive, actually was an amount of cash paid each year to trade in their automobile on a new car. Petitioners have not introduced any evidence to support their contention. Moreover, it would be a strange coincidence if the cash paid in connection with a trade-in in each of three years would be precisely the same. In the absence of evidence supporting petitioners' contention in this respect, respondent's determination is sustained. *202 Findings of Fact House Trailer (Item 16) Petitioners purchased a 1955 model house trailer in September 1954 for which they paid $2,600 or $2,700 cash and a boat in trade. The trailer was registered in Charles's name. Charles advised respondent's agent that the trailer was on hand on December 31, 1954, and that the value of the trailer was approximately $3,000. The agent included the asset in the net worth schedule at $3,000. The addresses given by Charles on his income tax returns for 1954 and 1955 were trailer parks. Opinion House Trailer (Item 16) Respondent included a house trailer in petitioners' net worth schedule as of December 31, 1954, in the amount of $3,000. Petitioners, on brief, contend that said trailer was purchased by their son, Richard, for living accommodations while in the army service, and that since Richard did not own a checking account "he purchased said check from his father, Charles, thus paying for the trailer himself." Petitioners argue further that they rented a trailer during the period in question and lived in the same trailer court as Richard. The arguments so pressed on brief, however, are not supported by the record. Moreover, there is no evidence *203 that Richard actually paid his father for the trailer. Under the circumstances, we are of the opinion that petitioners have failed to prove error in respondent's determination that the trailer be included as an asset in the net worth statement. Respondent determined $3,000 as the cost of the trailer, while petitioners argue that $2,800 is the correct cost. The vague evidence on this issue fails to reconcile the narrow difference. Under the circumstances, since respondent's determination was not arbitrary, and since petitioner has failed to establish error, we must sustain respondent's determination with respect to the house trailer. Findings of Fact and Opinion Personal Living Expenses (Item 29) In connection with the sale to Snyder-Adams of the theater properties in 1954, petitioners compiled amounts they had allegedly expended for personal living during each of the years 1951 to 1953, and during the first seven months of 1954 as follows: 1951
1952
1953
1954
Recorded Expenditures for family
$4,122.24
$4,395.29
$6,689.66
$10,711.84
living
Respondent incorporated such admissions regarding personal living expenses in the "below the line" adjustments in his net worth schedule for each of the years *204 ending December 31, 1951, to 1953, inclusive. For the year ended December 31, 1954, however, respondent found duplications (trailer and auto payments) would arise in the net worth schedule if he relied solely on the compilation presented in the Snyder-Adams litigation. Accordingly, after elimination of items previously taken into account on the net worth analysis, he determined personal living expenses for 1954 in the amount of $6,965.38, rather than $10,711.84 alleged by petitioners in their civil suit. Personal living expenses for 1947 to 1950 have been stipulated by the parties to be in the respective amounts of $3,430.12, $2,884.77, $2,389.29, and $2,010.10. As to the years 1951 through 1954, inclusive, petitioners, who have the burden of proof on this issue, have failed to introduce any convincing evidence to controvert their own admissions regarding the amounts of personal living expenses pleaded in the Snyder-Adams case. Under the circumstances, we find petitioners' argument, on brief, as to this disputed item, untenable. Accordingly, respondent's determination is sustained. Findings of Fact and Opinion Additions to Tax (section 291(a) of the 1939 Code and section 6651(a) of *205 the 1954 Code.) Ruth filed no Federal income tax returns for the taxable years 1953 and 1954. Charles filed separate returns for said years. After dividing corrected community property income between petitioners, respondent determined that Ruth's failure to file her returns for each of the taxable years within the period allowed by statute, was not due to reasonable cause within the meaning of sections 291(a) and 6651(a), both supra. E. H. Stanton, 21 B.T.A. 1380-1381 (1931). The issue is one of fact and the burden of establishing reasonable cause is on Ruth. Wm. J. Lemp Brewing Co., 18 T.C. 586, 597 (1952); Alma Williams, 16 T.C. 893, 906 (1951). At the outset we note that Ruth failed to assign error with respect to respondent's determination of additions to tax under section 6651(a), supra, for the year 1954. Ordinarily the issue as to 1954 would not be properly before us, but since both parties have addressed themselves to the issue at the hearing and on brief we think it appropriate to consider it to the extent of stating that the principles to be applied to 1954 in the instant case are the same as those to be applied to 1953, and that our conclusion with respect to 1953 *206 is also dispositive of 1954. In explanation and as exculpatory circumstances of her failure to file a return for 1953, Ruth testified that she and Charles were separated at the time and after they told their accountant, (a certified public accountant) that Ruth had not received any income for taxable purposes during 1953 and 1954, the accountant "took care of the matter." Petitioner, on brief, contends that during the taxable period in question she had no separate taxable income and for living expenses during this period she used savings she had accumulated in prior years. Charles argues that he reported all income of the marital community in 1953 and 1954 on his separate returns for said years and actually overpaid the tax due on said income since he failed to take Ruth and his son as dependents. Petitioners were "legally separated," as defined in section 51(b)(5)(B)[2] *207 of the 1939 Code. At the same time, however, they do not claim that the return filed by Charles actually was intended to be a joint return. Paul Gordon Whitmore, 25 T.C. 293, 298 (1955). A personal good faith belief on the part of taxpayer that he is not required to file an income tax return is not sufficient of itself to discharge the addition to tax under sections 291(a) and 6651(a). Taxpayers deliberately omitting to file returns must use reasonable care to ascertain that no returns were necessary. We think Ruth did not use such care. Here, there is no evidence that petitioner, in reliance upon competent advice of an individual qualified to assist on tax matters, came to the conclusion that she did not have to file a separate return. See Estate of Michael Collino, 25 T.C. 1026, 1036 (1956). In the absence of such evidence, mistaken belief on the part of petitioner that no return was required under *208 the statute does not constitute reasonable cause for noncompliance. The P. Dougherty Co., 5 T.C. 791, affd. 159 F. 2d 269 (C.A. 4, 1946), certiorari denied 331 U.S. 838; Genevra Heman, 32 T.C. 479 (1959). There is no evidence distinguishing the problem as to 1954 in any significant way from that of 1953. In the light of the foregoing, we hold that Ruth has not met the burden of proving that her failure to file a timely return for the years 1953 and 1954 was due to reasonable cause. Accordingly, we approve the imposition of an addition to tax for said years under sections 291(a) and 6651(a), both supra. Findings of Fact Fraud Issue By their own admissions, petitioners intentionally understated income from operation of the theater business and concessions operated incidental thereto and avowedly had made substantial profits in each of the taxable years 1947 to 1954, inclusive. Petitioners used only a checkbook for record keeping purposes. They employed an accountant to prepare their tax returns. Taxable income in each of petitioners' returns for 1947 to 1954, inclusive, was consistently and intentionally understated as a result of the fact that while Charles provided the accountant *209 with information as to all his expenses, he knowingly failed to furnish the full amount of his income. In December 1951, petitioners sold three theater properties to Robert T. and Carmen Hagman. As a part of this transaction the Hagmans separately purchased merchandise and supplies (peanuts, popcorn, candy, etc.), and also so-called "rent films." Payments from the Hagmans to petitioners for inventory and film rental were made during 1951 and 1952. Hagman also purchased 265 theater seats from Charles for $2 per seat on September 22, 1952. The Hagmans paid $1,700.21 in 1951, and $1,400.66 in 1952 for inventory and film rental. These amounts, as well as the proceeds from the sale of the theater seats in 1952, were omitted from petitioners' tax returns for 1951 and 1952. The Hagmans continued to rent film from petitioners during the first month of 1953. Charles did not report any income from the sale of inventory or film rental from the Hagmans in his 1953 individual return. Charles received payments from the United Film Service for advertising films shown in his various theaters, which payments Charles claims to have turned over to his projectionist in payment of wages. United Film Service *210 paid Charles $88 during the year 1954, but records regarding such payments for earlier years were unavailable. Charles made no reference to the aforesaid $88 in his 1954 individual return. Snyder and Adams also purchased inventory from petitioners in a transaction separate and apart from their July 1954 agreement to purchase the theater and laundromat. The payments to Charles in this transaction was $1,154 which amount is not reported on Charles's 1954 return. Petitioners admit that they did not correctly record and report income from concessions in their theaters for the years 1951 to 1953, inclusive. While there is no evidence as to what petitioners' income from concessions was during any of the taxable years involved herein, records and returns for the years 1951 to 1953, inclusive, purport to show purchases in amounts double the amounts sold. Respondent's agent sampled cancelled checks against records of business expense for 1951 and 1952 to ascertain whether any disbursements were actually expended for other than business purposes. There were 157 checks totaling $4,502, which were improperly classified by petitioners in 1951 and 1952. Thirty percent of the amount of said checks *211 represented disbursements for other than business purposes. Inadequate records prevented audits of such disbursements in 1953 and 1954. For other pertinent facts, see findings, supra, relating to "Propriety of Use of Net Worth Method." We find as an ultimate fact that some part of the respective deficiencies in income tax for each of the years 1947 through 1952, inclusive, was due to fraud with intent to evade tax on the part of petitioners. Likewise, some part of the deficiency in income tax for the year 1953 and underpayment for the year 1954, for which years Charles filed separate returns, and Ruth filed no returns, was due to fraud with intent to evade tax on the part of Charles. Opinion Fraud Issue Initially we note that the additions to tax for fraud were determined against petitioners for the years 1947 through 1952, inclusive, and against Charles alone for the years 1953 and 1954 when he filed separate returns. Respondent has the burden of establishing fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751 (1950). It is not incumbent upon respondent to prove that the entire deficiency or underpayment in any one or more years was based on fraud as a basis for *212 sustaining additions to tax under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code which require only that some part of such deficiency or underpayment be due to fraud with intent to evade tax. Our conclusions as to fraud are based upon a consideration of the entire record properly before us on that issue, and we are not limited to a consideration of respondent's affirmative evidence. Frank Imburgia, 22 T.C. 1002 (1954); Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Co., 25 B.T.A. 419 (1931). We also recognize that in this, as in many fraud cases, the proof of fraud, if it is to be established, may depend, in some respects, upon circumstantial evidence. Fraudulent intent can seldom be established by a single act or by direct proof of the taxpayer's intention. It is usually found by surveying his whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly drawn therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). Our finding of an understatement in taxable income for each of the years 1947 through 1954, inclusive, for the purposes of the deficiencies involved, was based in some respects upon petitioner's *213 failure to meet his burden of proof. We recognize that respondent cannot meet his own burden of establishing fraud on the basis of petitioner's failure to discharge the burden of proving error in the determination of deficiencies, and we do not, of course, rest our finding of fraud on such failure. It must be affirmatively established that each return in question was false and fraudulent with intent to evade taxes, and that some part of each deficiency or underpayment is due to fraud with intent to evade taxes if additions to taxes under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code are to be approved. Section 1112, 1939 Code; section 7454(a), 1954 Code. Drieborg v. Commissioner, 225 F. 2d 216, 218 (C.A. 6, 1955), affirming in part a Memorandum Opinion of this Court. After a painstaking analysis of all of the evidence in this case and bearing in mind the above-stated principles, we are convinced that petitioners received taxable income during each of the years 1947 through 1952, inclusive, and Charles during 1953 and 1954, from their activities as operators of theaters in excess of that reported on their returns for those years, and that in each of said years *214 a part of the deficiency or underpayment was due to fraud with intent to evade taxes. It is well settled that respondent, in sustaining his burden of proof, need not prove the precise amount of the deficiency or underpayment attributable to such fraud, but only that a part of the deficiency or underpayment is attributable thereto. United States v. Chapman, 168 F. 2d 997 (C.A. 7, 1948), certiorari denied 335 U.S. 853. The understatements of income in each of the years 1947 to 1954, inclusive, were both substantial in amount (though not precisely determined) and substantial in proportion to reported income of which we have no doubt that petitioners were fully aware. The courts have held that consistent understatements of income in substantial amounts over a number of years are persuasive evidence of fraudulent intent to evade taxes. Shahadi v. Commissioner, 266 F. 2d 495 (C.A. 3, 1959); Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming on this point a Memorandum Opinion of this Court; Bryan v. Commissioner, 209 F. 822, 828 (C.A. 5, 1954), certiorari denied 348 U.S. 912; Jack M. Chesbro, 21 T.C. 123 (1953), affd. 225 F. 2d 674 (C.A. 2, 1954), certiorari denied *215 350 U.S. 995; Rogers v. Commissioner, 111 F. 2d 987, 989 (C.A. 6, 1940), affirming 38 B.T.A. 16; W. A. Shaw, 27 T.C. 561, 570 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). In Epstein v. United States, 246 F. 2d 563, 566 (C.A. 6, 1957), certiorari denied 355 U.S. 868, the Court stated (p. 933): The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Kurnick v. Commissioner, supra, 232 F. 2d 678; Drieborg v. Commissioner of Internal Revenue, 6 Cir., 225 F. 2d 216. In Holland v. United States, supra, 348 U.S. 139, * * * the Supreme Court declared that "evidence of a consistent pattern of underreporting large amounts of income" will support "an inference of willfulness." * * *
As indicated above, in the instant case the correct net income for each of the years 1947 to 1954, inclusive, substantially exceeded the amount reported by petitioners, bearing in mind that additions to tax for fraud were not determined against Ruth for 1953 and 1954. Their understatements of income were so large, regular, and frequent, extending over a period of at least the eight years 1947 to 1954, inclusive, that there is no escape from the *216 inference of a deliberate intention to defraud the Government of the taxes lawfully due it. While the net worth method is not so precise as to preclude the possibility of minor inaccuracies, facts for each of the years 1947 through 1954 preclude the possibility of any inaccuracies of sufficient size as to explain away or successfully refute the otherwise obvious inference of deliberate fraud. In addition to the consistent pattern of substantial understatements, the record is replete with facts and convincing circumstantial evidence which sustain the view that respondent has met his burden of establishing that the petitioners knowingly and intentionally evaded their taxes during the taxable years 1947 through 1954, inclusive. Without suggesting that the following discussion is at all complete, we merely advert to the following indicia of fraud. During each of the years in the net worth period, petitioners failed to maintain records of all of their business receipts and kept the accountant they employed to prepare their returns for the years involved uninformed of their total receipts. Petitioners admit that their failure to report all of their income was deliberate, and offered no *217 tenable explanation for such failure. We have no doubt that concealment from the tax authorities and evasion of taxes was a primary objective. Arlette Coat Co., 14 T.C. 751 (1950); Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F. 2d 240 (C.A. 5, 1955). Charles was an educated man and could not have been unaware of his obligation as a taxpayer. Persuasive indicia of fraud are also found in the fact that petitioners admittedly failed to report income from concessions in their theaters for the years 1951 to 1953, inclusive; failed to report amounts received from the Hagmans on their returns in 1951 ($1,700.21) and in 1952 ($1,400.66) for inventory and film rental; Charles did not report any receipts from the Hagmans for said items in his 1953 individual return; and Charles failed to report advertising fees from United Film Service, or payments for inventory sold to Snyder-Adams in his 1954 return. Another badge of fraud is that petitioners improperly classified 157 checks in 1951 and 1952 in the total amount of $4,502, of which amount 30 percent represented disbursements for other than business purposes. There is no credible evidence that these errors were made by petitioners' *218 accountant as urged on brief. We think it clear, without going into furtheir detail, that fraudulent intent to evade taxes may be inferred from petitioners' conduct in failing to report the aforesaid receipts, and by inflating the amount of business expenditures, the likely effect of which was to mislead or conceal. See Spies v. United States, 317 U.S. 492, 499 (1943). We recognize that the foregoing is based to some extent upon inference from circumstantial evidence, but it is equally clear that circumstantial evidence, if clear and convincing, is sufficient of itself to establish fraudulent understatements, especially when taken in connection with taxpayer's failure to keep proper records. As already stated, Charles' cash hoard story is untenable and does not account for the increase in net worth during the years involved. The record discloses only two sources of income, theater operation and gain on sale of theater business. No source for the unreported income is revealed by the net worth analysis, except current taxable income and gain. In our view, there is no plausible explanation for gross understatements of income over a period of eight years revealed by the net worth reconstruction, *219 except petitioners' calculated evasion of income tax. Upon consideration of all relevant factors, we hold that a part of each deficiency for the years 1947 through 1952, inclusive, was due to fraud with intent to evade taxes; and that some part of the deficiency and underpayment for the years 1953 and 1954, for which Charles filed separate returns, and Ruth filed no returns, was due to fraud with intent to evade tax. Accordingly, additions to tax under section 293(b) of the 1939 Code and section 6653(b) of the 1954 Code are to be applied. It is also apparent from the foregoing that petitioners' returns for the taxable years 1947 through 1952, inclusive, were false and fraudulent with intent to evade taxes, and it is therefore unnecessary to discuss further the contention raised by petitioners for the first time on brief that assessment was barred by limitations for those years. Findings of Fact Repossession Gain - 1955 The properties sold to Snyder-Adams on July 25, 1954, and later repossessed by petitioners consisted of real estate (land and building), merchandise inventory and personal property in Newport, Washington, and a leasehold, together with merchandise inventory and personal *220 property in Priest River, Idaho, connected with petitioners' ownership and operation of two theaters and a laundromat. The selling price was $125,000. At the time of the sale, the parties placed a value on the properties located in Newport, Washington, at $90,000, and those situated in Priest River, Idaho, at $35,000. The Newport, Washington, property exclusive of merchandise inventory and equipment, consists of land upon which there is constructed a concrete block, two-story building with full basement. On the street level there is a laundromat, a theater and a small business office. There is a modern five-room apartment on the second floor and an apartment in the basement. The major construction of the building was completed in 1951 and 1952. The Newport building is the newest and only building of its type in the town. There are no comparable properties in Newport. Petitioners repossessed the properties sold to Snyder-Adams in September 1955. In his statutory notice of deficiency for the taxable year ending December 31, 1955, respondent determined, inter alia, as follows: (b) It has been determined the gain on the repossession of the New Newport
and Priest River
theaters is ordinary gain rather than capital gain pursuant to section 453 of
the Internal Revenue
Code. The gain on the repossession is computed as follows:
Fair market value at date of repossession
$125,000.00
Improvements by purchasers
2,330.41
$127,330.41
Unpaid balance of contract from purchasers
$109,052.47
Deferred profit (35.45%)
38,659.10
70,393.37
Repossession gain
$ 56,937.04
Your reported income is accordingly increased by
$56,937.04.
After *221 making several adjustments with respect to depreciation on said theaters and giving petitioners credit for the standard deduction, respondent determined a deficiency for 1955 in income tax against petitioners in the amount of $24,179.65. Petitioners contest only the adjustment with respect to the repossession gain for 1955. Opinion Repossession Gain - 1955 For the taxable year 1955, respondent determined that petitioners realized a gain in the amount of $56,937.04 from repossession of the properties that were sold to Snyder-Adams in July 1954. In arriving at this figure, respondent determined that the fair market value of the properties at date of repossession was $125,000. Petitioners do not question the techniques used in the computation (see Reg. 1.453-6) but claim that the fair market value of the repossessed properties at the date of repossession was substantially less than $125,000. It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being informed of the material considerations. Of course, the fair market value of *222 property at a particular time is a question of fact to be determined from all the circumstances connected with the agreement, and there is no single formula universally applicable in determining such value. Meadow Land & Improvement Co. v. Commissioner, 124 F. 2d 297 (C.A. 8, 1941); Walter F. Haass, 37 B.T.A. 948, 957 (1938). Respondent's determination is prima facie correct and the burden of proof of error rests with petitioners. Affirmative support of his determination is to be found from the fact that the selling price in an arm's-length transaction only 14 months before repossession was $125,000. Petitioners contend that respondent in determining fair market value at the time of repossession failed to take into consideration the alleged worthlessness of the Priest River theater or a repossession loss on the Newport property. Petitioners argue that they incurred a repossession loss of approximately $35,000 on the Priest River property and about $11,000 on the Newport property. There is no evidence, however, supporting the contention that the Priest River property was worthless at time of repossession, or that there was a repossession loss of $35,000 on that property or an $11,000 *223 repossession loss on the Newport property. Petitioners, in support of their position that the valuation of $125,000 at time of repossession was excessive, argue that the cost of the Newport building was only $49,000, although they later concede that the cost was $56,869.61. The actual cost of the property, exclusive of inventory and equipment, was approximately $82,000. Assuming that we accept one or the other of the two figures urged by petitioner, it would at best be merely a factor to consider, and upon the present record would not affect our conclusion. Petitioners, who have the burden of proof, submitted no testimony from qualified appraisers regarding the value of the Newport property as of the date of repossession. In this respect, petitioners rely only upon a May 2, 1961, Pend Oreille County tax assessment which does not purport to fix a 1955 value. It is our view that a value placed upon the property for the purpose of local taxation, unsupported by any other evidence, cannot be accepted as determinative of fair market value of the property for Federal income tax purposes, particularly in the absence of evidence of the method and purpose for which the assessment was made. *224 Helen Barclay, Executrix, 4 B.T.A. 1139 (1926); Helen D. Emmet, 11 T.C. 90 (1948). Upon consideration of all of the circumstances of record applicable to this issue, we think it clear that petitioners have failed to prove error in respondent's determination. Findings of Fact and Opinion Carryback Losses By amendment to the pleadings, petitioners alleged that respondent's net worth computation must include the years 1956 and 1957 because (a) sale of capital assets, that is, theaters, was not completed during the years involved herein, and (b) losses were incurred in 1956 and 1957. With respect to the sales of capital assets, petitioners urge that in considering the deficiencies involved in the net worth period, we also consider capital losses claimed in years subsequent to the taxable years in question. Petitioners specifically plead a "write-off" or capital loss of the Hagman installment sale during 1957 in the amount of $49,000, which loss is claimed as a basis to decrease petitioners' net worth and provide carryback deductions to taxable years 1953 through 1955, inclusive, under review in the instant case. Petitioners, on brief, argue that the sale price of the theaters to Hagman *225 was $80,000, and their original profit on the sale was $26,202.81, but because of two adjustments in 1957, the actual profit on the sale was $26.56. In our view, petitioners' contention that the Hagman contract was "written off" in 1957, is without merit. The record shows that the Hagman contract, as modified by the agreement of April 11, 1957, was in effect until June 1960, when the Hagmans satisfied their liability to petitioners. The balance of the escrow contract was mutually reduced to $4,895.44 on April 11, 1957, and the Hagmans, in addition, gave petitioners a $10,000 promissory note which has not yet been paid off. Payments on the escrow contract continued until June 1960, at which time the bank's records reflect satisfaction of the contract. Respondent allowed a net operating loss carryback deduction from the year 1956 to the taxable year 1954. There is no evidence to support a conclusion that petitioners are entitled to a loss carryback deduction in excess of that allowed by respondent. Manifestly, petitioners' allegations are based upon a misunderstanding of the net worth method. The net worth method is merely a means of marshaling evidence, not a bookkeeping system. Estate of George L. Cury, 23 T.C. 305 (1954). *226 Accordingly, even if petitioners had submitted proof of amounts of the claimed capital losses, such losses would have no effect on the net worth analysis for the period 1947 to 1954, inclusive, and, being capital in nature, are not subject to carryback deductions in reconstructing unreported income during each year of the net worth period under consideration. The losses claimed by petitioners in their amendments to the petitions, being capital in nature, are subject only to carryover rather than carryback deduction. Section 1212, Code of 1954. [3] Hence, even if petitioners had submitted affirmative proof of capital losses, such losses would not affect respondent's determinations of deficiencies for the taxable years involved herein. In the light of the foregoing, we hold that petitioners are *227 not entitled to loss carryback deductions in the years involved in this proceeding, except as allowed by respondent in his notices of deficiency. In their amended pleadings, petitioners also alleged that repossession of the Newport and Priest River properties in 1955 resulted in a total loss of $14,163.03, thereby decreasing their net worth and resulting in a loss carryback. The record fails to support this claim. A further indication of petitioners' inconsistency of approach appears from our discussion under "Repossession Gain - 1955" where petitioners, in objecting to respondent's determination of fair market value, argued that they incurred a "repossession loss" of about $35,000 on the Priest River property, and approximately $11,000 on the Newport property. For lack of proof by petitioners, we sustain respondent on this issue. Decisions will be entered under Rule 50. Footnotes
*. For the year 1954, sections 6651(a)and 6653(b), 1954↩ Code. **. At the trial respondent claimed increased deficiencies in income tax and addition to tax for the taxable year 1947 which are reflected in the foregoing totals.↩
1. The official name of the proceeding is Darrell D. Snyder, et ux., and Robert H. Adams, Plaintiffs v. Charles Bishop, et ux., Defendants, Docket No. 4557 in the Superior Court of the State of Washington for Pend Oreille County.↩
*. Unreported income is divided and distributed by respondent to Charles and Ruth equally as their separate share of community property income for the years 1953 and 1954.↩
*. Item 8, Exh. N, shows this amount as reduction of principal from 1950 to 1951. However, the record indicates the amount of $1,113.30, which figure fails to conform with Exh. N or the total principal paid ($1,968.58) as computed by respondent's agent.
2. SEC. 51. INDIVIDUAL RETURNS. * * *
(b) Husband and Wife. - (1) In general. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. * * *
(5) Determination of status. - For the purposes of this section - * * *
(B) an individual who is legally separated from his spouse under a decree of divorce or of separate maintenance shall not be considered as married. * * *↩
3. SEC. 1212. CAPITAL LOSS CARRYOVER. If for any taxable year the taxpayer has a net capital loss, the amount thereof shall be a short-term capital loss in each of the 5 succeeding taxable years to the extent that such amount exceeds the total of any net capital gains of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year. * * *↩